# In the United States Court of Federal Claims

No. 24-1313

Filed: December 31, 2025

|  |  |
|---|---|
| SIEMENS GOVERNMENT TECHNOLOGIES, INC., | ) ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) ) |
| *Defendant*. | ) ) ) |

*Robert S. Nichols*, Nichols Law LLP, Washington, DC, for Plaintiff Siemens Government Technologies, Inc.

*Thomas J. Adair*, Trial Attorney, United States Department of Justice, Civil Division, Washington, D.C., with whom was *Corinne A. Niosi*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brett Shumate*, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

This case arises from a potential energy savings project at Goodfellow Air Force Base in San Angelo, Texas. Siemens Government Technologies, Inc. sought a task order to implement certain energy saving measures at Goodfellow, but things did not go as planned. The Government continued to change its requirements and then decided not to issue the task order at all. Believing that it is entitled to compensation for certain costs it incurred pursuing the potential task order, Siemens sued under the Contract Disputes Act and this court's bid protest jurisdiction. The Government moves to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. The court defers the motion to dismiss as to Count I and denies the motion as to Counts II and III.

### I. BACKGROUND

#### A. Statutory Framework.

Under the National Energy Conservation Policy Act ("NECPA"), 42 U.S.C. § 8201 *et seq.*, the Department of Energy ("DOE") administers an energy savings program. 42 U.S.C. § 8287. Congress established a two-step procurement process to award contracts under this program. *See id.* at §§ 8287(a)(1), (c).

First, DOE awarded multiple IDIQ contracts that cover the potential work.  *See* ECF No. 1-2 at 28 (§H.3.1); *Siemens Gov't Techs., Inc. v. United States*, 177 Fed. Cl. 165, 168 (2025) (*Siemens I*) (DOE "award[s] umbrella indefinite delivery, indefinite quantity ('IDIQ') energy savings performance contracts ('energy contracts') to energy contractors.").  Second, agencies that wish to implement energy cost savings projects may issue task orders under the IDIQ contracts.  ECF No. 1-2 at 28 (§H3.1).  These agencies issue a notice of opportunity to the IDIQ holders that solicits proposals for the scope of work the agency seeks.  *Id*. at 29 (§H.3.2).  The agency then selects a contractor to provide the preliminary assessment, "which provides the conceptual range of the expected [Energy Conservation Measures], costs and savings for the project."  *Id*.  Further, the preliminary assessment "sets out the merits, technical feasibility, range of projected energy savings, economics, and conceptual price range of the project."  *Id*. at 33 (§H.4.1).  And "[t]he ordering agency will not be responsible for any costs associated with PA audits or preparation of the PA unless the project addressed by the PA later becomes a TO award."  If the ordering agency and the contractor agree to move forward, the agency issues a notice of intent to award and then a task order request for proposal.  *Id*. at 29 (§H.3.2).  The contractor then submits its proposal that includes a technical section and a financial section.  *Id*. at 34-35 (§H.5.1).  The technical proposal includes an investment grade audit.  *Id*.  Here, "[t]he ordering agency will not be responsible for any costs incurred, such as proposal preparation costs or costs incurred in preparing the IGA, unless a [task order] is awarded or such costs are otherwise authorized for payment by the ordering agency [contracting officer]."  *Id*.  The agency and contractor then negotiate, and the agency can issue a task order for the work.  Id. at 29 (§H.3.2).

Pay under these contracts is performance-based to further maximize Congress's goals of cost and energy savings.  Specifically, the contractor must pay to acquire and install whatever equipment the parties agree to, then the contractor earns a share of the cost savings that equipment generates against the baseline (pre-installation) energy costs.  42 U.S.C. § 8287(a)(1) ("Such contract shall provide that the contractor shall incur costs of implementing energy savings measures, including at least the costs (if any) incurred in making energy audits, acquiring and installing equipment, and training personnel, in exchange for a share of any energy savings directly resulting from implementation of such measures during the term of the contract.").  In other words, "while energy contractors bear the cost of implementing energy savings measures, they get a cut 'of any energy savings directly resulting from implementation of [energy savings] measures during' the contract's lifespan."  *Siemens I*, 177 Fed. Cl. at 169 (quoting 42 U.S.C. § 8287(a)(1)).  Alongside these 42 U.S.C. § 8287(a)(1) requirements, contracting agencies may include provisions providing for discretionary reimbursement in the IDIQ contracts.

### B.    The Goodfellow Air Force Base Project.

DOE issued energy savings performance contract ("ESPC"), No. DE-EE0008041 to Siemens (the "IDIQ Contract").  ECF No. 31 ¶ 12.  Siemens is an "expert energy service company that has performed more than 40 task orders pursuant to multiple energy savings performance contracts."  *Id*. ¶ 11.  The IDIQ Contract is intended to "promote the use of renewable energy technologies, acquire energy and water conservation services, reduce energy or water consumption and associated utility costs, and that may reduce energy and water-related

2

operations and maintenance . . . costs." ECF No. 1-2 at 6.[1]  The IDIQ Contract covers "providing all personnel, facilities, equipment, materials, supplies, and services to install energy and water conservation projects and renewable energy projects."  ECF No. 1-2 at 6.

On June 28, 2019, the Defense Logistics Agency ("DLA") "issued a notice of opportunity for a project at Goodfellow Air Force Base" in San Angelo, Texas, to the IDIQ contract holders, including Siemens.  ECF No. 31 ¶¶ 21, 24.  DLA intended to issue a task order to only a single contractor.  *Id.* ¶ 24.  After reviewing the responses, DLA selected Siemens to prepare a preliminary assessment.  *Id.* ¶ 31.  On July 24, 2020, Siemens submitted its final preliminary assessment to DLA.  *Id.* ¶ 33.  In turn, on October 1, 2020, DLA issued a notice of intent to award a task order and directed Siemens to design a project "focused on the construction of a power plant for Goodfellow" and other measures to increase energy efficiency.  *Id.* ¶ 34.  Siemens thus prepared an investment grade audit, which it submitted to DLA August 11, 2021.  *Id.* ¶¶ 34-35.  The investment grade audit is "a labor-intensive review of the facilities to determine whether the proposed energy conservation measures are viable, meaning that they will pay for themselves over time in energy savings."  *Id*. ¶ 35.  Siemen's initial audit included three blocks of set pricing rates.  *Id.* ¶¶ 36-39.  Shortly after submission, DLA sent Siemens new pricing blocks to consider in its audit.  *Id.* ¶ 40.  These new values required Siemens to conduct "another full audit," imposing a "significant cost" on Siemens.  *Id.* ¶ 41.

After Siemens explained to the Government the significant cost its direction would impose on Siemens, the Government "directed Siemens to design three Courses of Action ('COAs') for a viable project that would reflect" new pricing the Government had negotiated for energy production.  *Id.* ¶ 41.  But Siemens determined that the new pricing blocks would "endanger[] the viability of the project."  *Id.*  Siemens, therefore, provided only one of the three requested courses reflecting the changes the Government sought.  *Id.* ¶¶ 42-43.  This process repeated—the Government requesting additional courses of actions with varying value changes, and Siemens proffering responses noting the project viability, or lack thereof.  *Id.* ¶¶ 43-50.  After much back and forth, the Government issued a stop work order pursuant to 48 C.F.R. § 52.242-15.  *Id.* ¶ 51.

On May 2, 2023, Siemens submitted a certified claim to DLA seeking reimbursement of $2,835,412 in development costs it incurred.  *Id.* ¶¶ 5, 6.  On August 25, 2023, DLA issued the contracting officer's final decision denying Siemens's certified claim.  *Id.* ¶¶ 5, 61.  Siemens also submitted a certified claim to the DOE in July 2024.  *Id.* ¶¶ 6, 62.  On September 9, 2024, DOE issued the contracting officer's final decision denying Siemens's certified claim.  *Id.* ¶ 6.  On August 26, 2024, Siemens filed this action, subsequently amending its complaint on September 8, 2025, to include the DOE's denial.  ECF No. 1; ECF No. 31.  The Government then moved to dismiss under 12(b)(1) and (6).  ECF No. 11.

## II.    Legal Standard

---

[1] Because Siemens did not attach the IDIQ Contract as an exhibit in the Amended Complaint, ECF No. 31, the court cites to ECF 1-2 to reference the IDIQ Contract.

### A.     RCFC 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

"Subject matter jurisdiction is a threshold issue that must be determined at the outset of a case." *King v. United States*, 81 Fed. Cl. 766, 768 (2008) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1365 (Fed. Cir. 2007). When a Rule 12(b)(1) motion challenges this court's jurisdiction, the burden rests on the plaintiff to establish jurisdiction by a preponderance of the evidence. RCFC 12(b)(1); *Haynes v. United States*, 122 Fed. Cl. 166, 169 (2015); *Williams v. United States*, 165 Fed. Cl. 72, 74 (2023) (first citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); and then citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). Siemens, as plaintiff, must meet this burden. When the court addresses a 'facial' challenge to the complaint based on subject matter jurisdiction, . . . the court must assume that the facts alleged in the complaint are true and correct." *CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 556 (2000). If the court determines that it lacks jurisdiction, it must dismiss the case. *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### B.     RCFC 12(b)(6) Motion to Dismiss for Failure to State a Claim

"'A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the plaintiff do not entitle him to a legal remedy.'" *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327 (Fed. Cir. 2006) (quoting *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000)); RCFC 12(b)(6). As the Supreme Court explained, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And to be "plausible on its face," it "does not need detailed factual allegations." *Twombly*, 550 U.S. at 555; *see also Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (Rule 8 "does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face"). In other words, the complaint must contain enough detail "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) (citations omitted). Nevertheless, the court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *United Pac. Ins. Co.*, 464 F.3d at 1327-28 (quoting *Anaheim Gardens v. United States*, 444 F.3d 1309, 1314-15 (Fed. Cir. 2006)). As nonmovant, the court accepts Siemens's well-pled allegations as true when evaluating the Government's motion.

### III.    Discussion

The complaint contains three counts. Count I alleges that the Government breached the terms and conditions of the IDIQ contract brought pursuant to the Contract Disputes Act. ECF

No. 31 ¶¶ 64-73.  Siemens brings Counts II and III under this court's bid protest jurisdiction.  *Id.* ¶¶ 74-82 (Count II), 83-94 (Count III).  Count II alleges that "the Government's failure to act in good faith on this procurement violated the Government's implied-in-fact contract duty to treat Siemens honestly and fairly for the task order procurement."  *Id.* ¶ 75.  More specifically, Siemens argues that "each of the Government's failures [alleged in the complaint] constituted independent instances of conduct that was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' that breached the Government's implied-in-fact contract to treat offerors fairly."  *Id.* ¶ 78 (quoting 5 U.S.C. § 706).  In Count III Siemens alleges that the Government violated various statutes and regulations when conducting this procurement.  *Id.* ¶¶ 83-91.  Thus, Siemens alleges that the Government's failure to adhere to proper procedure amounted to actions that were "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'without observance of procedure required by law.'"  *Id.* ¶ 71 (quoting 5 U.S.C. § 706).

The Government initially moved to dismiss all three counts under Rules 12(b)(1) and 12(b)(6).  ECF 11.  After briefing and argument was complete, Siemens filed the amended complaint with the Government's consent.  ECF Nos. 29, 31.  The amended complaint adds allegations relating to the CDA claim in Count I but does not change anything regarding the factual allegations or claims in Counts II and III.  *See* ECF No. 29; *compare* ECF No. 1 *with* ECF No. 31.  In response, the Government has filed a supplemental motion to dismiss Count I that raises new arguments.  ECF Nos. 34, 37, 41.  Because this briefing did not complete until earlier this month, the court defers ruling on the motion to dismiss Count I until hearing argument on the supplemental motion to dismiss.  The court therefore considers the motion to dismiss Counts II and III.

        A.        **FASA does not bar Counts II or III.**

The Federal Acquisition Streamlining Act ("FASA") limits the court's jurisdiction over bid protests related to task orders.  10 U.S.C. § 3406(f).  FASA provides that a "protest is not authorized *in connection with the issuance or proposed issuance* of a task or delivery order except for (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or (B) a protest of an order valued in excess of $25,000,000."  10 U.S.C. § 3406(f)(1) (2024) (emphasis added).[2]  FASA thus bars protests that "challenge[] the issuance of [a] task order directly" or that challenge "government action (*e.g.*, waiver of an organizational conflict of interest) whose wrongfulness would cause [a] task order's issuance to be improper."  *Percipient.ai, Inc. v. United* States, 104 F.4th 839, 847 (Fed. Cir.), *reh'g en banc granted, opinion vacated sub nom. Percipient.ai, Inc. v. United States*, 121 F.4th 1311 (Fed. Cir. 2024), *and on reh'g en banc sub nom. Percipient.AI, Inc. v. United States*, 153 F.4th 1226 (Fed. Cir. 2025), *cert. filed*, ___ U.S. ___ (U.S. Oct. 08, 2025) (No. 25-428).  The phrase "in connection with the issuance of a task order" can be understood by looking to the remedy sought.  *See SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1414 (Fed. Cir. 2014)

---

[2] Congress has since amended FASA to increase the dollar threshold, but that change has no impact on this case.

(looking to the relief sought to determine FASA's applicability). Though not dispositive, the remedy informs whether the FASA bar applies. *See id.*

The Government first argues that Counts II and III "relate[] to the Government's conduct in connection with the proposed issuance of a task order"; thus, those claims are barred under FASA. *See* ECF No. 11 at 11; ECF No. 34 at 2 n.2. To start, the Government points to the language of the IDIQ contract and the "subject conduct." *See* ECF No. 11 at 11. The Government contends that because Siemens challenges conduct that was "part of the *process* for issuing a task order," FASA removes jurisdiction from this court to hear these claims. *Id.* at 11 (emphasis added). This argument reads the FASA bar too broadly.

This is the third case Siemens has brought to this court in the last year challenging various task order awards under its IDIQ contract. In *Siemens I*, this court found that the FASA bar did not bar Siemens's claims that are materially similar to those in this case. *Siemens I*, 177 Fed. Cl. at 172. In *Siemens I*, this court explained that

> Mere connection to a task order, however, is not enough for FASA to apply. Rather, the protest must relate to the "issuance or proposed issuance of a task order" before FASA will bar the suit. Therefore, while FASA bars challenges to "government action[s] in the direct causal chain sustaining the issuance of a task order," not "all actions taken under or after issuance of a proper task order" are "directly and casually connected" to a task order's issuance.

*Id.* at 172 (quoting *Percipient.ai, Inc.*, 104 F.4th at 849). To decipher whether the alleged actions were "'directly and casually connected' to a task order's issuance," the court looked to the requested remedy. *See id.* at 172-73. In *Siemens I*, like here, the plaintiff sought reimbursement for preparation and audit costs—not the setting aside of a task order. *Id.* at 172. To grant this "purely monetary" remedy would thereby leave any task order unaffected. *Id.* at 172-73; *see also SRA Int'l, Inc.*, 766 F.3d at 1414 (evaluating the relief sought to determine FASA's applicability). The court then found that where the requested relief does not "alter" or "displace" the issuance of a task order, the protest is not considered "in connection with the issuance or proposed issuance of a task or delivery order." *See Siemens I*, 177 Fed. Cl. at 172-73; *see also Percipient.ai, Inc.*, 104 F.4th at 851 (finding FASA inapplicable where the "requested relief would not alter" the underlying task order). Therefore, the FASA bar did not apply. The result today is the same.

Another recent Siemens case involved similar legal claims. *Siemens Gov't Techs., Inc. v. United States*, 176 Fed. Cl. 450 (2025) (*Siemens II*). There, the court again held that the FASA bar did not apply to Siemens's claims. *Id.* at 453. In coming to this conclusion, the court applied a two-part test: "*[f]irst*, a proposed or issued task order must exist to be protested"; and, "*[s]econd*, the protest must be predicated upon the proposed or issued task order." *Id.* at 457. In *Siemens II*, the Government's arguments failed under both prongs.

6

The court explained that "[a]n agency must have 'issued or proposed [the] issuance of a task . . . order' for the jurisdictional bar to apply." *Id.* at 457. Consequently, "if no task order has either been awarded or proffered by an agency, then the FASA bar is inapplicable." *Id.* at 457. In *Siemens II*, the Government allegedly sought proposals under a solicitation "that it had previously awarded . . . to another corporation for the same services." *Id.* The court concluded that "no agency need equals no offer that can be accepted; or put differently, no proposed task order existed." *Id.* at 459; *see id.* at 457 ("Without a 'realistic' need, the Agency's solicitation was illegitimate—meaning it cannot propose . . . a need that is already fulfilled—and, thus, the U.S. Navy could neither have awarded a contract to Siemens nor could Siemens have accepted that award.")(citations omitted). Without any viable task order, this court found that "[i]n this unique context, FASA's bar is inapplicable because the task order was void from the start." *Id.* Given the factual distinctions between *Siemens II* and this case, it is meaningfully distinguishable.

But the legal analysis is informative. In *Siemens II*, the court also considered the remedy sought to determine FASA's applicability. *Id.* at 457, 459 (citing *Percipient.ai, Inc.*, 104 F.4th at 849-51). In *Siemens II*, like here, Siemens sought reimbursement for bid preparation costs following the Government's alleged conduct during the procurement process. *Id.* at 455. Relying on *Percipient.ai, Inc.*, 104 F.4th at 849-51, the court explained that though not dispositive, the "'in connection with' element [is linked] to the form of relief requested by a plaintiff." *Siemens II*, 176 Fed. Cl. at 459 (citing *SRA Int'l, Inc.*, 766 F.3d at 1414). The FASA bar was inapplicable where the claim and relief sought did "not assert the wrongfulness of, or seek to set aside, any task order." *Id.* at 457 (quoting *Percipient.ai, Inc.*, 104 F.4th at 847). The court then concluded that "Siemens has never sought to set aside or generally interfere with any pending or issued task order; it only wishes to be made whole after being led astray by the U.S. Navy's false procurement needs—a claim FASA does not bar." *Id.* at 457.

Here, Siemens does not seek a task order or to set aside a task order. Siemens seeks only the repayment of the allegedly unnecessary expenses that it incurred solely due to the Government's arbitrary conduct during the procurement process. ECF No. 31 at ¶¶ 82, 94 ("The Government's actions damaged Siemens, causing it to needlessly incur $2,835,412 in development costs. . . ."). The Government argues that under the IDIQ contract, any challenge to the "subject conduct" is barred under FASA. ECF No. 11 at 11. Not so. Though the procedures outlined in the IDIQ contract "'will be used' in deciding whether to issue a task order," the court need not look to actual issuance to find a claim sufficiently stated for unfair process. More pointedly, the court could grant Siemens's claims for reimbursement without "affecting" or "altering" the decision to not issue a task order. *See e.g.*, *Siemens II*, 177 Fed. at 172-73; *Percipient.ai, Inc.*, 104 F.4th at 851. Because Siemens's claims are not "directly and casually connected" to the issuance of a task order and the requested relief would leave the task order unaffected, the FASA bar does not apply.

Consequently, the Government's motion for lack of subject matter jurisdiction for Counts II and III is denied.

**B.    Siemens plausibly stated its claims for breach of contract the implied contract to be treated fairly.**

7

In Count II, Siemens alleges that the Government breached the implied contract to treat Siemens fairly in the task order procurement. This is based on an alleged implied-in-fact contract with DLA to treat Siemens fairly in the task order procurement that DLA conducted. ECF No. 31 ¶ 75. This is not a claim under the Contract Disputes Act, it is an implied-in-fact claim that is brought under this court's bid protest jurisdiction in 28 U.S.C. § 1491(b)(1). *See Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021).

Here the Government seeks to put Siemens into a "heads you lose, tails I win" situation. It is undisputed that the existence of an express contract precludes an implied contract theory based on matters the express contract covers. *See* ECF No. 12 at 12 (quoting *Laudes Corp. v. United States*, 85 Fed. Cl. 152, 161 (2009) ("There is no question that the existence of an express contract precludes an implied-in-fact contract between the parties on the same subject matter.")). While it is true that Siemens alleges that DLA's conduct of the procurement violated the IDIQ Contract provisions dictating how DLA, as the ordering agency, must conduct the procurement. And Siemens brings a claim under the CDA for that conduct based on those IDIQ Contract provisions. ECF No. 31 ¶¶ 68-71. But the Government argues that Siemens's CDA claim fails because the IDIQ Contract is with DOE, not DLA, and Siemens does not allege that DOE did anything wrong. ECF No. 34 at 5-6. But the Government also argues that Siemens cannot bring the implied-in-fact contract under § 1491(b)(1) because of the IDIQ Contract. ECF No. 11 at 15-16. The Government, however, cannot assert that the IDIQ Contract does not apply to DLA's conduct but bars the implied-in-fact contract that attaches to procurements to treat offerors fairly. In the end, the court does not resolve the viability of the CDA claim at this stage. The implied-in-fact contract claim, therefore, is a viable alternative theory of recovery at this stage.

The court therefore denies the motion to dismiss Count II.

## IV.   Conclusion

For the forgoing reasons, the court denies-in-part the motion to dismiss, ECF No. 11, insofar as it seeks to dismiss Counts II and III, and defers the motion insofar as it seeks to dismiss Count I.

It is so ORDERED.

s/ Edward H. Meyers<br>
Edward H. Meyers<br>
Judge